IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| JOEL I. SHER,<br>*Chapter 11 Trustee for TMST, Inc.* | : |
| Plaintiff | : |
| v. | :     Civil Case No. L-11-1998 |
| RBC CAPITAL MARKETS, LLC | : |
| Defendants | : |

o0o
## MEMORANDUM

Plaintiff, Joel I. Sher ("Trustee"), in his capacity as Chapter 11 Trustee for TMST, Inc., f/k/a Thornburg Mortgage, Inc. ("TMST"), brings this suit against Defendant RBC Capital Markets, LLC ("RBC"). The Trustee alleges that in 2007, by taking improper advantage of fluctuations in the market for mortgage-backed securities ("MBS"), RBC issued improper margin calls and wrongfully seized and liquidated MBS that it held as collateral pursuant to repurchase agreements between RBC and TMST. The Trustee further alleges that RBC acted in a commercially unreasonable manner in soliciting bids for the MBS, resulting in a final credit to TMST for far less than fair value. The Complaint advances claims for Breach of Contract (Count I) and Breach of the Implied Covenants of Good Faith and Fair Dealing (Count II).

Now pending is RBC's Motion to Dismiss. Docket No. 12. The issues have been comprehensively briefed, and the Court finds oral hearing unnecessary. See Local Rule 105.6 (D. Md. 2011). For the reasons stated herein, the Court will, by separate Order of even date, GRANT IN PART and DENY IN PART RBC's Motion.

I.  **BACKGROUND**

The following facts are drawn from the Complaint and documents integral thereto.[1] TMST was, until its delisting in 2008, a publicly traded real estate investment trust.  TMST invested in MBS supported primarily by high-grade adjustable-rate mortgages.  TMST's earnings were derived from the spread between the interest income it earned on the MBS and the cost of borrowing to acquire and own them.  TMST financed its acquisition of MBS primarily through financing agreements with investment banking and securities firms such as RBC.  These transactions were generally in the form of repurchase agreements.

In a typical repurchase agreement, the buyer (lender) will advance funds to the seller (borrower).  The seller uses the funds to acquire MBS, which it sells to the buyer.  At the same time, the seller agrees to repurchase the MBS at a later date, for a higher price.  Though different in form, the transaction effectively serves as a secured loan, with the difference in sale price and repurchase price representing the cost of financing.

Like any readily traded asset, the value of MBS fluctuates with market conditions.  In order to ensure that the MBS are always sufficient collateral to secure the loan, the buyer may issue a margin call to the seller if the value of the MBS drops below a certain predetermined level.  The seller must then turn over additional cash or securities to satisfy the deficit.  Likewise, if the value of the MBS increases above a certain level, the seller may take out the excess by issuing a reverse margin call.

On September 8, 2003, RBC and TMST entered into a Master Repurchase Agreement ("MRA"), an umbrella agreement that would govern multiple individual repurchase transactions. Pursuant to the MRA, if TMST failed at any time to meet a margin call or to repurchase

---

[1]  In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents attached to the complaint and to the motion, so long as they are integral to the complaint and authentic.  Phillips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009)

securities as required by a maturing repurchase agreement, RBC had the option to declare an Event of Default.  RBC was then entitled either to (a) "immediately sell" part or all of the collateral MBS "in a recognized market (or otherwise in a commercially reasonable manner) at such price or prices as [TMST] may reasonably deem satisfactory," or (b) keep the MBS and give TMST credit "in an amount equal to the price therefor on such date, obtained from a generally recognized source or the most recent closing bid quotation from such a source."  MRA ¶11(d)(i), Docket No. 14-3.

As of August 9, 2007, TMST had 21 repurchase transactions outstanding with RBC, consisting of 30 separate MBS.  The Complaint alleges that as of August 13, 2007, these MBS had an approximate value of $573.2 million.

Most of the individual repurchase agreements between the RBC and TMST had maturities of six months.  When these agreements would mature, instead of TMST repurchasing the MBS, the parties would usually roll the agreements over for another term.  At that time, TMST would be required to pay RBC an amount equal to any accrued and unpaid interest, as well as any change in price on the MBS.  According to the Complaint, "Such rolls were settled by means of a 'pair-off', in which TMST's repurchase of the MBS was off-set by RBC's purchase of the same MBS at the new amount based on current market values.  In such a transaction, no MBS actually traded hands; instead the difference in the trade was calculated, and cash or other collateral was transferred to the appropriate party to satisfy the difference."  Compl. ¶ 16, Docket No. 8.  The Complaint states that "[t]hese 'pair-offs" were a form of margin."  Id.

On August 10, 2007, an outstanding repurchase agreement matured.  The Complaint states that RBC agreed to roll the transaction over for one month, with the result that TMST owed to RBC a $1.1 million pair-off.  TMST did not immediately satisfy this pair-off, however.

On August 13th, five more repurchase agreements matured. RBC again agreed to roll the agreements over for another month, this time resulting in a $4.2 million pair-off. The same day, RBC served TMST with a margin call in the amount of $10.3 million. TMST satisfied the $10.3 million margin call, but did not satisfy the $4.2 million pair-off.

On August 14th, RBC issued another margin call in the amount of $11 million and, in support, provided TMST with market prices for the collateral MBS, valuing them at $576.3 million. The same day, RBC Managing Director Richard Tavoso also faxed TMST a letter stating that RBC "hereby declares an Event of Default to have occurred under the MRA as a result of [TMST's] failure to repurchase Purchased Securities upon the applicable Purchase Dates." Correspondence from R. Tavaso to TMST (August 14, 2007), Docket No. 14-12.

On August 15th, TMST disputed RBC's $11 million margin call of the previous day, contending that RBC had undervalued the collateral MBS by some $6.2 million. TMST also satisfied the $1.1 million pair-off that had been outstanding since August 10th.

On August 16th, Tavoso emailed TMST: "I need to either get an agreement as far continuing [*sic*] the repo for one month or I need to start soliciting bids for the entire portfolio. In the auction process, we will be soliciting bids for the portfolio as a whole in order to gauge its worth." Id. ¶21. Though the Complaint states that the parties continued discussions, it does not reflect that they ever came to an agreement either to roll over the repurchase transactions that had matured on August 13th or to satisfy the disputed August 14th margin call.

By letter dated August 21, 2007, RBC informed TMST that, pursuant to the default declared on August 14th, it had exercised its rights and taken 27 MBS[2] into its own account, crediting TMST's account with their value. The letter stated that "[t]o determine the deemed

---

[2] While RBC originally held 30 collateral MBS, TMST had sold three during the week of August 14th and used the proceeds to settle the three corresponding repurchase agreements.

purchase price . . . of the Remaining Securities, we obtained bids from three generally recognized dealers, Bear Stearns, Lehman Brothers and Goldman Sachs." Correspondence from R. Tavaso to Patrick Feldman (August 21, 2007), Docket No. 14-7.  The letter went on to recite that RBC had elected to credit TMST with the highest of the three bids, yielding a credit of $356,291,737.  The letter does not reflect the date of the bids or the manner in which they were obtained.

The Trustee now alleges that RBC breached the terms of the MRA, as well as the implied covenants of good faith and fair dealing, when it declared default and took possession of the collateral MBS.  The Complaint claims that the "bid prices RBC obtained and credited to TMST were more than $35 million lower than the prices RBC itself attributed to the same MBS in its August 14, 2007 margin call marks," and that " TMST's own pricing information indicates that RBC's alleged August 14, 2007 bid prices were undervalued by more than $80 million." Compl. ¶26.  In the Trustee's view, the manner in which the MBS were liquidated is "totally suspect," and he asserts that "the bids were not obtained independently or otherwise in a commercially reasonable manner." Id. ¶28.

## II.   LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead plausible, not merely conceivable, facts in support of his claim.  See Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007).  The complaint must state "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 1965.  The court must, however, "assume the veracity [of well-pleaded factual allegations] and

then determine whether they plausibly give rise to an entitlement of relief." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009).

### III. ANALYSIS

#### a. Breach of Contract

Because there are factual disputes as to the process by which RBC obtained bids and determined the amount that it would ultimately credit to TMST's account, the Trustee's breach of contract claim will proceed to discovery. It is important, however, to delineate the proper scope of the claim.

The Complaint quite clearly takes issue with the manner in which the liquidation amount was calculated. In addition to his allegations regarding the nature of the bid process, the Trustee argues that, while a fair reading of the MRA would seem to say that RBC was obligated to credit TMST with the fair value of the collateral MBS as of the date that it declared default, RBC did not even start soliciting bids until at least two days later. In addition, RBC ultimately settled on a number that was significantly lower than the value it had assigned to the MBS when it issued its August 14th margin call. Whether this process was proper under the terms of the MRA is a valid subject for discovery.

At various points in its papers, however, the Trustee also takes issue with RBC's declaration of an event of default. It claims that "the Complaint alleges that RBC breached the express provisions of the MRA when it improperly declared an Event of Default" and that "the August 14 Margin Call was improper and disputed and therefore RBC wrongfully seized TMST's MBS in the absence of a valid Event of Default." Pl.'s Opp. 14, Docket No. 30, 7 n.6. There appear to be two, related bases for this claim. First, the Trustee seems to argue that RBC

was not permitted to declare default based on a margin call if TMST disputed RBC's calculations. Second, the Trustee argues that the declaration of default was improper because the disputed margin call and the declaration of default both occurred on August 14th. The MRA gave TMST at least until the end of the business day to post cash or additional securities to satisfy a margin call.³ Thus, the Trustee maintains that "in breach of the MRA, RBC declared an Event of Default during the morning of August 14, 2007, well before TMST's deadline to respond to the August 14 Margin Call." Id. at 15.

As an initial matter, there is a substantial question as to whether a fair reading of the Complaint actually advances any claim on the basis of the declaration of default itself. Assuming arguendo that the Complaint does advance such a claim, however, it would fail because RBC's declaration of default was indisputably based, not on the August 14th margin call, but on TMST's failure to satisfy the pair-offs that had come due days before. TMST did not pay off the $1.1 million August 10th pair-off until after default had been declared, and it never paid off the $4.4 million August 13th pair-off. Thus, RBC's decision to declare default on August 14th was valid under the terms of the MRA, which gave it the right to do so in the event that TMST "fail[ed] to repurchase . . . Purchased Securities . . . upon the applicable Repurchase Date." MRA ¶11 (defining "Event of Default"). TMST did not repurchase the MBS, nor did it pay the pair-off amounts that would have enabled it to delay its obligation to do by rolling the contracts over.

The Trustee's contention that "[t]he August 14 Letter is unclear as to whether RBC was declaring an Event of Default based upon a failure to make one of the pair-offs or a failure to satisfy the August 14 Margin Call," Pl.'s Opp. 7, is belied by a cursory reading of the letter itself.

---

³ If the margin call was issued past a certain hour, TMST would have until the end of the next business day. See MRA ¶¶ 2(i), 4(c).

The letter unambiguously states: "[RBC] hereby declares an Event of Default to have occurred under the MRA <u>as a result of [TMST's] failure to repurchase Purchased Securities upon the applicable Purchase Dates</u>."  Docket No. 14-12 (emphasis supplied).  The Trustee can maintain no cognizable claim that RBC's declaration of default constituted a breach of the MRA.

### b. Breach of Implied Covenant of Good Faith and Fair Dealing

Count II of the Complaint alleges that RBC violated the duty of good faith and fair dealing inherent in all contracts

> by, among other things:
> a. Claiming to have obtained bids in connection with the liquidation TMST's [*sic*] MBS at a time when it already acknowledged it had not yet begun seeking bids;
> b. Crediting TMST with purported default date liquidation prices when it had obtained no such prices;
> c. Intentionally and capriciously soliciting bids in a manner calculated to produce unreasonably low prices for purposes of crediting TMST; and
> d. Intentionally failing to provide accurate and detailed information regarding its purported liquidation of TMST's MBS.

Compl. ¶37.  RBC seeks dismissal of this claim on the grounds that under New York law, which governs the MRA, a plaintiff may not state a claim for breach of the covenant of good faith and fair dealing that is simply duplicative of a claim for breach of contract.

Under New York law, all contracts imply a covenant of good faith and fair dealing in the course of contract performance.  <u>Dalton v. Educ. Testing Serv.</u>, 663 N.E.2d 289, 291 (N.Y. 1995).  "This embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion."  <u>Id.</u> (quotation and citations omitted).  Notwithstanding the existence of this covenant, New York law "does not recognize a separate

cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." Harris v. Provident Life and Accident Ins. Co., 310 F.3d 73, 81 (2nd Cir. 2002).

In another case brought by the Trustee on almost identical facts, Judge Hollander of this Court considered the question whether the Trustee's claims for breach of the implied covenant were duplicative of his claims for breach of contract. See Sher v. Barclays Capital, Inc., Civil No. ELH–11–01982, 2011 WL 3957526 (D. Md. Sept 7, 2011). In that case, the Trustee alleged that the defendant, Barclays Capital, had issued improper margin calls, improperly declared a default, and failed to use commercially reasonable methods to liquidate several MBS, thus recovering several million dollars less than the value that it had attributed to the same MBS as of the default date. Id. at *3. The Trustee further alleged that the defendant had breached the implied covenant of good faith and fair dealing by "using improper and unconventional methods for assigning values to TMST's MBS as a means of generating false margin deficits; failing to agree on a third-party source to provide independent values for TMST's MBS when TMST disputed Barclays' August 13, 2007 margin call, [and] engaging in self-dealing to obtain arbitrary and artificially low prices for TMST's securities that Barclays decided to retain for itself." Id. at *7 (internal quotation marks omitted). Judge Hollander dismissed the Trustee's claim for breach of the implied covenant, holding that the claims were redundant and duplicative. Id. at *9.

There is no need to repeat the analysis here. The Trustee's claims for breach of contract and breach of the implied covenant in the case sub judice, like his claims in Sher v. Barclays Capital, Inc., "are based entirely on the same underlying factual predicates." Id. As such, Count II of the Complaint must be dismissed.

## IV.  CONCLUSION

For the foregoing reasons, the Court will, by separate Order of even date, GRANT IN PART and DENY IN PART  RBC's Motion to Dismiss.  A Scheduling Order to govern the course of discovery will follow.

Dated this 23rd day of March, 2012

/s/
_____
Benson Everett Legg
United States District Judge