IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JOEL I. SHER,                          :

    Plaintiff,                     :

v.                                     :     Civil Action No. GLR-11-1998

RBC Capital Markets, LLC,              :

    Defendant.                     :

**<u>MEMORANDUM OPINION</u>**

THIS MATTER is before the Court on Defendant's, RBC Capital Markets, LLC (as successor in interest to RBC Capital Markets Corporation and RBC Dominion Securities Corporation) ("RBC"), Motion for Summary Judgment (ECF No. 127), which is supported by a Memorandum of Law (Def.'s Summ. J. Memo, ECF No. 131) and voluminous exhibits. Plaintiff Joel I. Sher, Chapter 11 Trustee ("Trustee") for Thornburg, Inc., f/k/a Thornburg Mortgage, Inc. ("Thornburg"), opposes the Motion, and has filed a Cross-Motion for Summary Judgment. (ECF No. 139). In support of his Motion, the Trustee also filed a Memorandum of Law (Pl.'s Summ. J. Memo, ECF No. 139-1) and hundreds of pages of exhibits. Also pending is RBC's Motion to Exclude the Testimony of the Trustee's Expert, Gregory W. Minard. (ECF No. 133). The issues have been fully briefed and no hearing is necessary. See Local Rule 105.6 (D.Md. 2014). For the reasons that follow, RBC's Motion for Summary Judgment will be denied, RBC's Motion to Exclude the

Testimony of the Trustee's Expert, Gregory W. Minard, will be denied as moot, and the Trustee's Cross Motion for Summary Judgment will be granted.

## I. BACKGROUND[1]

Thornburg, until its delisting in 2008, was a sophisticated publicly traded real estate investment trust, investing in residential mortgage-backed securities ("RMBS" or "MBS") supported primarily by high-grade adjustable-rate mortgages. The RMBS at issue in this case are bonds representing an ownership interest in a group of residential mortgage loans. Residential homeowners make mortgage payments which are ultimately pooled each month. These pooled payments are then "passed through" to RMBS holders in the form of principal and interest cash flow. RMBS feature two primary risks for investors: first, the risk that homeowners will refinance their mortgages when interest rates decline and, second, the risk that homeowners will fail to make full and timely payments on their mortgage loans. Thus, any unexpected increase in refinancing or defaults will adversely impact the value of MBS.

Thornburg's earnings were derived from the spread between the interest income it earned on the RMBS and the cost of

---

[1] Unless otherwise noted, the following facts are taken from the Complaint and the parties' briefings on the instant Motions, and are viewed in the light most favorable to the nonmoving party.

borrowing to acquire and own them. Thornburg financed its acquisition of MBS primarily through financing agreements with investment banking and securities firms such as RBC. These transactions were generally in the form of repurchase agreements ("repo transactions") and were governed by an umbrella Master Repurchase Agreement ("MRA").

In a typical repo transaction, the buyer (lender) will advance funds to the seller (borrower). The seller uses the funds to acquire MBS, which it sells to the buyer. At the same time, the seller agrees to repurchase the MBS at a later date, for a higher price. Though different in form, the transaction effectively serves as a secured loan, with the difference in sale price and repurchase price representing the cost of financing.

Like any readily traded asset, the value of MBS fluctuates with market conditions. To ensure that the MBS are always sufficient collateral to secure the loan, the buyer may issue a margin call to the seller if the value of the MBS drops below a certain predetermined level. The seller must then turn over additional cash or securities to satisfy the deficit. Likewise, if the value of the MBS increases above a certain level, the seller may issue a reverse margin call.

Many times, upon the maturity of the individual repo transaction, the parties would enter into roll over agreements.

When a repo transaction matured, instead of Thornburg repurchasing the MBS, the parties would agree to "roll" the transaction into another term. At that time, Thornburg was required to pay RBC an amount equal to any accrued and unpaid interest, as well as any change in price on the MBS. Roll over agreements were settled by means of a "pair-off," in which Thornburg's repurchase of the MBS was off-set by RBC's purchase of the same MBS at the new amount based on current market values. The difference in the trade was calculated, and cash or other collateral was transferred to the appropriate party to satisfy the difference.

On September 8, 2003, RBC and Thornburg entered into a MRA that would govern anticipated repo transactions between the parties. The MRA is attached to RBC's Motion for Summary Judgment as Exhibit 9. (Def.'s Mot. for Summ. J. Ex. 9 ["MRA"], ECF No. 128-9).

In August 2007, the MBS market began experiencing sudden and unprecedented declines due to panic, and a variety of other factors, amidst the widely chronicled collapse of the subprime mortgage and housing markets. As of August 9, 2007, Thornburg had twenty-one repo transactions outstanding with RBC, consisting of thirty separate MBS. The Complaint alleges that, as of August 13, 2007, these MBS had an approximate value of $573.2 million.

4

On August 10, 2007, an outstanding repurchase agreement matured. RBC agreed to roll the transaction over for one month, which resulted in Thornburg owing RBC a $1.1 million pair-off. Thornburg, however, did not immediately satisfy this pair-off. On August 13, five more repurchase agreements matured. RBC again agreed to roll the agreements over for another month, this time resulting in a $4.2 million pair-off. The same day, RBC served Thornburg with a margin call in the amount of $10.3 million. Thornburg satisfied the $10.3 million margin call, but did not satisfy the $4.2 million pair-off.

On August 14, RBC issued another margin call in the amount of $11 million and, in support, provided Thornburg with its internal margin call price estimates for the collateral MBS, valuing them at $576.3 million. The same day, RBC Managing Director Richard Tavoso faxed Thornburg a letter stating that RBC "hereby declares an Event of Default to have occurred under the MRA as a result of Thornburg's failure to repurchase Purchased Securities upon the applicable Purchase Dates." (Correspondence from R. Tavaso, ECF No. 128-35).

Pursuant to the MRA, if Thornburg failed at any time to meet a margin call or to repurchase securities as required by a maturing repurchase agreement, RBC had the option to declare an Event of Default. Post-default, the MRA gave RBC two options to use Thornburg's MBS collateral to recover the loan proceeds.

RBC, in its sole discretion, could choose to (a) "immediately sell" part or all of the collateral MBS "in a recognized market (or otherwise in a commercially reasonable manner) at such price or prices as [RBC] may reasonably deem satisfactory," or (b) keep the MBS and give Thornburg credit "in an amount equal to the price therefor on such date, obtained from a generally recognized source or the most recent closing bid quotation from such a source." (MRA ¶11(d)(i)).

RBC attempted to sell the largest MBS on the day of Thornburg's default, but was unable to do so because of market conditions. Thornburg and RBC then attempted to negotiate multiple "workout" proposals. On August 15, Thornburg disputed RBC's $11 million margin call of the previous day, contending that RBC had undervalued the collateral MBS by some $6.2 million. Thornburg also satisfied the $1.1 million pair-off that had been outstanding since August 10.  The parties continued workout negotiations.

On August 16, Tavoso emailed Thornburg indicating that he needed "either . . . an agreement as far [as] continuing the repo for one month or . . . to start soliciting bids for the entire portfolio." (Email from R. Tavaso, ECF No. 128-49). Tavoso further advised Thornburg that "the auction process, [would include] soliciting bids for the portfolio as a whole in order to gauge its worth." (Id.).  The parties never came to an

agreement either to roll over the repurchase transactions that had matured on August 13, or to satisfy the disputed August 14 margin call. When the workout negotiations failed, RBC exercised its default remedies by electing to retain the collateral MBS and give Thornburg a credit based on an arm's-length bid that RBC obtained from Goldman Sachs.

By letter dated August 21, 2007, RBC informed Thornburg that, pursuant to the default declared on August 14, it had exercised its rights and taken twenty-seven MBS into its own account, crediting Thornburg's account with their value. The letter stated that "[t]o determine the deemed purchase price . . . of the Remaining Securities, we obtained bids from three generally recognized dealers, Bear Stearns, Lehman Brothers and Goldman Sachs." (August 21, 2007 Tavaso Correspondence, ECF No. 128-38). The letter went on to recite that RBC had elected to credit Thornburg with the highest of the three bids, yielding a credit of $356,291,737. (Id.) The letter does not reflect the date of the bids or the manner in which they were obtained. (See id.) After subtracting the total credit from the total outstanding loan amount, there was a shortfall of $8,021,511. (See id.) On August 28, 2007, Thornburg paid the $8,021,511 without objection.

The parties disagree as to whether the manner in which the liquidation credit was calculated was proper under the terms of

the MRA.   The amount of the credit was equal to the highest of three bids RBC received on August 17, 2007, from generally recognized sources Bear Stearns, Lehman Brothers, and Goldman Sachs. RBC argues the MRA afforded it sole discretion, as the non-defaulting party, to credit Thornburg with "any good faith price obtained from a generally recognized source."   (Def.'s Summ. J. Memo at 49).   Further, RBC argues it fully complied with the plain and unambiguous text of the MRA by crediting Thornburg with a price from a generally recognized source.

The Trustee, however, contends that a plain reading of ¶ 11(d)(i)(B) of the MRA requires that the credit be calculated with a price determined as of August 14, 2007, the date of default. The Trustee argues, therefore, that RBC's failure to credit Thornburg with a price determined as of the Default Date was a breach of the MRA; and, as a result of the breach, Thornburg sustained damages in the amount of $38,142,983, the difference between the Goldman Sachs bids as of August 17 and RBC's internal valuation of the bonds as of August 14.

On April 30, 2011, the Trustee filed suit against RBC in the United States Bankruptcy Court for the District of Maryland (Adv. Proc. No. 11-0339-DWK) asserting state-law claims for breach of contract (Count I) and breach of the covenant of good faith and fair dealing (Count II).   (See Compl., ECF No. 8). The Trustee alleged RBC breached the terms of the MRA, as well

8

as the implied covenants of good faith and fair dealing, when it declared default and took possession of the collateral MBS and with the manner in which the liquidation amount was calculated. (<u>Id.</u>).  On July 26, 2011, RBC's Motion to Withdraw the Reference was granted.  (ECF No. 7).

On March 23, 2012, this Court issued an Order and Memorandum granting in part and denying in part RBC's Motion to Dismiss.  (ECF Nos. 37, 38).  The Court, holding that RBC's declaration of default did not constitute a breach of the MRA, narrowed the proper scope of the breach of contract claim to whether the manner in which the liquidation credit was calculated was proper under the terms of the MRA.  (<u>See</u> Memo. Op., ECF No. 37).  Further, the Court dismissed Count II of the Complaint, finding that breach of the implied covenant of good faith was duplicative of a claim for breach of contract. (<u>See</u> <u>id.</u>).  The parties engaged in extensive discovery.  In accordance with the Amended Scheduling Order (ECF No. 116) and Order Approving Summary Judgment Briefing Schedule (ECF No. 118), the opposing summary judgment Motions have been fully briefed and are ripe for disposition.

## II. DISCUSSION

**A.    Standards of Review**

**1. The Summary Judgment Standard**

Under Federal Rule of Civil Procedure 56, the Court must grant summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a).

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970)). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247-48.

A "material fact" is a fact that might affect the outcome of a party's case. Id. at 248; JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001). Whether a fact is considered to be "material" is determined by the

substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001).

A "genuine" issue concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248. Rule 56(c) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The nonmoving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) (citing Barwick v. Celotex Corp., 736 F.2d 946, 963 (4th Cir. 1984)).

Because this case arises under the Court's diversity jurisdiction, the substantive law to be considered is that of the state in which the action arose. Estrin v. Nat. Answers, Inc., 103 F.App'x 702, 704 (4th Cir. 2004) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)). In this case, New York law applies.

11

### 2. Contract Interpretation Standard

Under New York law, the threshold question in a contract dispute is whether the terms of the contract are ambiguous. In re Motors Liquidation Co., 578 F.App'x 43, 44 (2d Cir. 2014) (quoting Revson v. Cinque & Cinque, P.C., 221 F.3d 59, 66 (2d Cir. 2000)). The interpretation of a contract that is clear and unambiguous is a question of law. Id. Where the contract's terms are unambiguous, the court must assign "the plain and ordinary meaning to each term and interpret the contract without the aid of extrinsic evidence." Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, Eng., 136 F.3d 82, 86 (2d Cir. 1998).

If the language used in the contract is objectively susceptible to more than one interpretation, the court may accept extrinsic evidence to ascertain the meaning intended by the parties. Chesapeake Energy Corp. v. Bank of N.Y. Mellon Trust Co., 773 F.3d 110, 118 (2d Cir. 2014) (Failla, J., dissenting). Where the Court resorts to extrinsic evidence, the contract's meaning becomes an issue of fact precluding summary judgment. Alexander, 136 F.3d at 86 (citing Seiden Assoc., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992)). The interpretation of an ambiguous contract may be resolved on summary judgment, however, where the non-moving party "fails to point to any relevant extrinsic evidence supporting that party's

interpretation of the language." <u>Fed. Ins. Co. v. Am. Home
Assur. Co.</u>, 639 F.3d 557, 567 (2d Cir. 2011) (citing <u>Compagnie
Financiere de CIC et de L'Union Europeenne v. Merrill Lynch,
Pierce, Fenner & Smith Inc.</u>, 232 F.3d 153, 158 (2d Cir. 2000)).

**B.   <u>Analysis</u>**

Generally, the parties agree that the plain and unambiguous
language of the MRA requires the non-defaulting party, electing
to retain collateral, to calculate a credit using a price
obtained from a generally recognized source "as of" the default
date.   Specifically, ¶ 11(d)(i)(B) of the MRA states: "The
nondefaulting party, may . . . elect . . . to give the
defaulting party credit for such Purchased Securities in an
amount equal to the price therefor on such date, obtained from a
generally recognized source . . . ."   Further, there is no
dispute that RBC valued and credited Thornburg with prices
obtained by a bid from an independent market participant on
August 17, 2007, three days after the default.

The Trustee argues, therefore, it is entitled to summary
judgment that RBC breached the MRA by failing to credit it with
"default date pricing" and, as a result of that breach, RBC's
August 14 Margin Call prices are the relevant and appropriate
measure of damages.   The Court presumes the Trustee's syllogism
is based on the position that the only available prices

reflecting the value of the collateral on the default date are RBC's internal marks.

Under the plain and unambiguous language of the MRA, however, the "price" must also be determined by a "generally recognized source." Thus, even assuming RBC is in breach of the MRA by failing to credit Thornburg with default date pricing, if RBC's internal marks do not constitute a "price obtained from a generally recognized source," there can be no basis for using those marks as an appropriate measure of damages. The Court must then consider whether RBC is entitled to summary judgment that it acted with good faith and within its contractual discretion to calculate the credit using a bid from an independent market participant on August 17, 2007.

The questions before the Court, therefore, are: (1) whether the MRA required RBC to credit Thornburg with default date prices; and (2) if so, whether RBC's internal valuations, created on the date of the default, constitute a price obtained from a generally recognized source such that those internal marks are a relevant and appropriate measure of damages.

    **1.   Default Date Pricing**

        **a.   Equitable Doctrines**

Preliminarily, RBC argues the equitable doctrines of waiver and ratification and estoppel bar the Trustee from arguing that

RBC breached the MRA by failing to credit Thornburg with default date pricing.  The Court disagrees.

### (1)  Waiver and Ratification/Acquiescence

First, RBC argues that because Thornburg, a sophisticated repo counterparty, never took the position that RBC should have used its internal marks to calculate the credit, Thornburg's actions constitute (1) a waiver of any entitlement to RBC's internal marks; and (2) complete acquiescence in and ratification of RBC's decision to calculate the credit based on the Goldman Sachs bid.

Under New York law, "a waiver is 'the voluntary and intentional relinquishment of a known right, which is not created by negligence, oversight, or silence.'" Amerex Grp., Inc. v. Lexington Ins. Co., 678 F.3d 193, 201 (2d Cir. 2012) (quoting Plato Gen. Const. Corp./EMCO Tech Const. Corp. v. Dormitory Auth. of State, 932 N.Y.S.2d 504, 511 (N.Y.App.Div. 2011)).  Because waiver depends on intent, there must be a clear manifestation of intent by a party to expressly or implicitly relinquish a known contract right.  Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc., 448 F.3d 573, 585 (2d Cir. 2006) (quoting Courtney–Clarke v. Rizzoli Intern. Publ'ns, Inc., 676 N.Y.S.2d 529 (N.Y.App.Div. 1998)).

Similarly, "[r]atification is the act of knowingly giving sanction or affirmance to an act which would otherwise be

unauthorized and not binding." <u>In re Adelphia Recovery Tr.</u>, 634 F.3d 678, 691 (2d Cir. 2011) (quoting 57 N.Y. Jur.2d Estoppel, Ratification, and Waiver § 87.6).  While acquiescence may give rise to an implied ratification, ratification "must be performed with full knowledge of the material facts related to the transaction, and the assent must be clearly established and may not be inferred from doubtful or equivocal acts or language." <u>Schroeder v. N. Fork Bank</u>, No. 07-CV-394-A, 2014 WL 1338797, at *5 (W.D.N.Y. Mar. 28, 2014) (quoting <u>Holm v. C.M.P. Sheet Metal, Inc.</u>, 455 N.Y.S.2d 429, 432 (N.Y.App.Div. 1982)).

RBC asserts, given Thornburg's contemporaneous receipt of RBC's August 13 and 14 internal margin call marks, as well as its sophistication and expertise in the MBS and repo financing industry, Thornburg's decision not to demand a credit based on RBC's internal marks was knowing, voluntary, and intentional. In support of its contention, RBC asserts that despite Thornburg's knowledge of RBC's August 13 and 14 internal margin call marks, Thornburg failed to claim at any point during the default, negotiation, or liquidation process that it was entitled to valuation of its MBS portfolio based on those internal marks but, in fact, elected to pay the $8 million shortfall that resulted from RBC's valuation based on the Goldman Sachs bid.  Further, RBC asserts that Thornburg never claimed its credit should have been based on RBC's internal

16

margin call marks at any point during the nearly two-year period
before Thornburg filed for bankruptcy in May 2009.  The Court
concludes that these facts fall short of establishing that
Thornburg engaged in clear or unequivocal conduct expressing an
intent to abandon its right to be credited for prices "as of"
August 14, 2007.

Moreover, the MRA contains a no-waiver clause.
Specifically, the clear and unambiguous language of the MRA
provides that: "No modification or waiver of any provision of
this Agreement and no consent by any party to a departure here
from shall be effective unless and until such shall be in
writing and duly executed by both of the parties hereto." (MRA
¶ 17).  New York courts "uniformly enforce" such provisions to
preclude an implied waiver.  See Rosenzweig v. Givens, 879
N.Y.S.2d 387, 390 (N.Y.App.Div. 2009), aff'd, 915 N.E.2d 1140
(N.Y. 2009) (explaining that New York courts uniformly enforce
unambiguous non-waiver clauses); see also MBIA Ins. Corp. v.
Patriarch Partners VIII, LLC, 842 F.Supp.2d 682, 709 (S.D.N.Y.
2012) (finding no implied waiver where the contract contained a
no waiver provision); Maxim Grp. LLC v. Life Partners Holdings,
Inc., 690 F.Supp.2d 293, 310 (S.D.N.Y. 2010) (same); but see
Kenyon & Kenyon v. Logany, LLC, 823 N.Y.S.2d 72, 74
(N.Y.App.Div. 2006) (finding that the existence of a nonwaiver
clause did not in itself preclude waiver of a contract clause

where plaintiff orally waived). In light of the foregoing authorities, the absence of an express waiver creates an insurmountable hurdle for RBC to prove Thornburg intentionally relinquished any contractual right.

### (2) Quasi-estoppel

Next, RBC argues the Trustee should be equitably estopped[2] from asserting RBC breached the MRA by failing to acquire default date prices because RBC delayed its liquidation efforts at Thornburg's request.

"The doctrine of equitable estoppel is properly invoked where the enforcement of the rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct." In re Vebeliunas, 332 F.3d at 93 (quoting Kosakow v. New Rochelle Radiology

---

[2] RBC argues the Trustee's claim is barred by the doctrine of quasi-estoppel. "Quasi estoppel operates to bar a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken by that party." HSBC Bank USA, Nat. Ass'n v. Adelphia Commc'ns Corp., No. 07-CV-553A, 2009 WL 385474, at *18 (W.D.N.Y. Feb. 12, 2009) (citing Erie Telecomms., Inc. v. City of Erie, 659 F.Supp. 580, 585 (W.D.Pa. 1987)). Because quasi-estoppel is based on "fundamental principles of equity," (id.), the Court will analyze this argument under the theory of equitable estoppel as discussed by the United States Court of Appeals for the Second Circuit applying New York contract law in In re Vebeliunas, 332 F.3d 85 (2d Cir. 2008). As discussed infra, however, the Court finds that RBC was not prejudiced by engaging in the workout negotiations at Thornburg's request. Thus, to the extent the doctrine of quasi-estoppel varies from the doctrine of equitable estoppel, if at all, the Trustee's claim is not barred by quasi-estoppel.

Assocs., P.C., 274 F.3d 706, 725 (2d Cir. 2001)).  A party is estopped where (1) its conduct amounts to a false representation or concealment of material facts; (2) it intended that such conduct would be acted upon by the other party; and (3) it had knowledge of the real facts.  Id. at 93-94 (citing Int'l Minerals & Res., S.A. v. Pappas, 96 F.3d 586, 594 (2d Cir. 1996)). The party asserting estoppel must also establish: (1) "lack of knowledge and of the means of knowledge of the true facts; (2) reliance upon the conduct of the party to be estopped; and (3) prejudicial changes in their positions."  Id. at 94 (citing Pappas, 96 F.3d at 594).

Following RBC's declaration of default, it attempted to sell several of the Thornburg MBS through an auction referred to as a "BWIC" ("bids wanted in competition") on the afternoon of August 14, 2007.  The BWIC generated no bids for the collateral. After the failed BWIC, Thornburg asked RBC to refrain from further attempts to liquidate the collateral because Thornburg believed the parties might be able to reach a workout agreement to resolve the default.  The parties' attempt to negotiate a work out failed, however, and RBC resumed its efforts to obtain bids for Thornburg's MBS portfolio.

RBC does not identify any fraudulent conduct on the part of Thornburg that would amount to a false representation or concealment of material fact.  RBC admits that the parties

mutually participated in a good faith attempt to negotiate a workout agreement. Moreover, there is no evidence that RBC was prejudiced by the workout negotiations. Nothing precluded RBC from obtaining prices for the MBS portfolio determined as of August 14, while concurrently negotiating with Thornburg to resolve the declaration of default.[3]   The undisputed record evidence demonstrates that RBC was, in fact, engaged in soliciting pricing for Thornburg's MBS portfolio simultaneously with the workout negotiations.[4]

Moreover, despite the parties' negotiations, RBC considered the August 14, 2007 default date operative and controlling. That is, RBC closed-out and terminated the parties' repo transactions as of August 14 and deemed its acquisition of the MBS to be as

---

[3] MBS prices are capable of being determined "as of" a prior particular date. (See Niculescu Dep. 173:15-19, Aug. 27, 2014, Ex. 197, ECF No. 150-4) ("[T]he intention, if possible, is to price as of the date of default, even if the pricing in fact has to be found at some later date, the pricing is intended to be as of that date if possible."); (see also Pl.'s Reply Ex. 195, ECF No. 150-2) ("I have another list of securities that I need prices on as of yesterday's close.").

[4] As of 6:26 p.m. on August 14, it was clear to RBC that the Bear Stearns workout proposal was not going to materialize and RBC was discussing ways to make the Thornburg MBS portfolio more marketable. (See Pl.'s Cross-Mot. Summ. J Ex. 85 ["email Re: Wall Street"] at 3-4, ECF No. 139-87).   Further, by mid-afternoon on August 15, Fortress provided a list to RBC of the Thornburg MBS it would be interested in bidding on (see id. at 1); Bear Sterns bid on seven of the individual MBS using pricing determined "as of" August 14 (see Pl.'s Reply Ex. 195 at 4, ECF No. 150-2); Cantor Fitzgerald bid on 10 of the MBS (see Pl.'s Reply Ex. 200, ECF No. 150-7); and Bank of New York provided RBC with prices for the entire Thornburg MBS portfolio (see Pl.'s Reply Ex. 200, ECF No. 150-8).

of the same date.[5]    If RBC believed it could not price the
collateral as of August 14, it could have deemed the date of
default and acquisition of the MBS to be August 17, the actual
date of valuation.    The Court finds that RBC was not prejudiced
by engaging in the workout negotiations at Thornburg's request;
and therefore, the Trustee is not equitably estopped from
asserting a breach.

### (3) Judicial-estoppel

Finally, RBC argues the doctrine of judicial estoppel bars
any claim by the Trustee that (1) RBC failed to determine the
credit given to Thornburg on a timely basis; and (2) the MRA
required RBC to calculate the credit using its internal margin
call marks, because the Trustee took inconsistent and
irreconcilable litigation positions in Sher v. Barclays Capital,
Inc., No. ELH-11-01982 (D.Md.) ("Barclays Litigation") and Sher
v. Goldman Sachs, No. CCB-11-2796 (D.Md.) ("Goldman Sachs
Litigation").

> Where a party assumes a certain position in a legal
> proceeding, and succeeds in maintaining that position,
> he may not thereafter, simply because his interests
> have changed, assume a contrary position, especially
> if it be to the prejudice of the party who has
> acquiesced in the position formerly taken by him.

In re Adelphia Recovery Tr., 634 F.3d 678, 695 (2d Cir. 2011)
(emphasis added) (quoting DeRosa v. Nat'l Envelope Corp., 595

---

[5] Beginning August 14, 2007, RBC collected and retained, as
its own, all principal and interest distributions from the MBS.

F.3d 99, 103 (2d Cir. 2010)).   The Second Circuit has applied judicial estoppel where "1) a party's later position is 'clearly inconsistent' with its earlier position; 2) the party's former position has been adopted in some way by the court in the earlier proceeding; and 3) the party asserting the two positions would derive an unfair advantage against the party seeking estoppel."   Id. at 695-96.   The Second Circuit further limits judicial estoppel to situations where "the earlier tribunal accepted the accuracy of the litigant's statements."   Id. at 696.

### (a)  Barclays Litigation

With respect to the Barclays Litigation, the Trustee did not argue Barclays breached the MRA by crediting Thornburg with amounts obtained on the default date, as RBC contends; rather, the Trustee argued a BWIC conducted by Barclays on the day of default was neither "commercially reasonable" nor conducted in good faith, as required by the MRA.   Sher v. Barclays Capital, Inc., 35 F.Supp.3d 725, 741 (D.Md. 2014).   Specifically, Thornburg argued Barclays intentionally structured the auction in a manner that would generate low bids enabling third parties who purchased the MBS at auction to flip those same MBS at a profit shortly after.   Id. at 744.   Second, the Trustee argued, with respect to three MBS Barclays retained, Barclays breached the MRA by crediting it with prices obtained through the

liquidation process because the liquidation prices were not
prices from a generally recognized source, as required by the
MRA. Id. at 745. Thus, the Court finds no clear inconsistency
between the Trustee's present and former positions.

### (b) Goldman Sachs Litigation

While the Court agrees there is some inconsistency in the
Trustee's position between this litigation and the earlier
Goldman Sachs Litigation, the inconsistency falls somewhere
below the "clearly inconsistent" standard set forth by the
Second Circuit. The Trustee did not take the blanket position
that Goldman Sachs violated the MRA because it credited
Thornburg with its "internal prices"; rather, the Trustee
alleged, Goldman was not a "generally recognized source" for
liquidation purposes because it ignored industry standards by
internally assigning arbitrary and artificially low liquidation
values. (Goldman Sachs Litigation, Memo. Opp'n Am. Mot. Stay;
Compel Arbitration and Stay or Dismiss; or, in the Alternative,
Dismiss at 31-35, ECF No. 32). In the Goldman Sachs litigation,
the Trustee did not object to the liquidation prices because
those prices were created by the non-defaulting party itself;
rather, it objected to the process by which the values were
determined.

Even assuming this inconsistency is enough to satisfy the
"clearly inconsistent" standard set forth by the Second Circuit,

judicial estoppel is not warranted because the Trustee's prior position cannot be viewed as having been successfully asserted. See Adler v. Pataki, 185 F.3d 35, 41 n.3 (2d Cir. 1999) ("[J]udicial estoppel applies only when a tribunal in a prior separate proceeding has relied on a party's inconsistent factual representations and rendered a favorable decision."). During the Goldman Sachs Litigation, the Honorable Catherine C. Blake granted Goldman Sachs's alternative request for relief to compel arbitration and stayed the matter pending the same. See generally Sher v. Goldman Sachs, No. CCB-11-2796, 2012 WL 1377066, at *1 (D.Md. Apr. 19, 2012). Thereafter, the parties filed a Stipulation of Dismissal. (Goldman Sachs Litigation, Stipulation of Dismissal, ECF No. 49). Thus, the doctrine of judicial estoppel is simply inapplicable, as a matter of law, because the Court did not have the opportunity to consider nor endorse the Trustee's argument. See Bates v. Long Island R. Co., 997 F.2d 1028, 1038 (2d Cir. 1993) (holding that a formal settlement between the parties does not provide the necessary level of judicial adoption to justify a finding of estoppel); see also Vinco Inc. v. Royal Ins. Co. of Am., 29 F.App'x 753, 756 (2d Cir. 2002) (holding that judicial estoppel did not apply where Plaintiff voluntarily withdrew its claim); Wight v. Bank Am. Corp., 219 F.3d 79, 90-91 (2d Cir. 2000) (holding that judicial estoppel did not apply where the allegedly inconsistent

24

position was not considered by the prior court).  Accordingly, the Court concludes that the doctrine of judicial estoppel does not bar the Trustee's claim.

### b.   Basic Principles of Contract Interpretation

Next, RBC argues basic principles of contract law prevent an interpretation of the MRA that requires a non-defaulting party to credit the defaulting party with collateral prices created by the non-defaulting party itself.  Under New York law, a contract provision should not be interpreted to render another provision meaningless.  See Ward v. TheLadders.com, Inc., 3 F.Supp.3d 151, 162 (S.D.N.Y. 2014) (quoting Givati v. Air Techniques, Inc., 104 A.D. 3d 644, 645 (2013)).

RBC contends that because a lender maintains daily internal marks in the ordinary course of business, there could never be a scenario in which no generally recognized source is available. As a result, RBC argues, interpreting the MRA to require a non-defaulting party to credit the defaulting party with collateral prices created on the date of the default by the non-defaulting party itself, would render meaningless the non-defaulting party's discrete right, under section 11(d)(2), to exercise its sole discretion in choosing a price for retained collateral where no generally recognized source for prices exists.

To clarify, the Trustee does not take the position that the MRA required RBC to use its internal marks; instead, the Trustee

25

takes the position that RBC's internal marks are the only available source to value the MBS as of the date of default and, as such, are the appropriate measure of damages. Nevertheless, the Court understands RBC's argument to be that because no default date pricing exists, there was no breach, and it was within its discretion to determine the credit using the August 17 bids. This argument fails on two grounds.

First, the plain and unambiguous language of ¶ 11(d)(2) permits the non-defaulting party, in its sole discretion, to establish the source for prices, not the price itself, in the absence of a "generally recognized source." Here, RBC expressly concedes that there were multiple generally recognized sources for pricing MBS on August 14.[6] Moreover, on the date of default, RBC attempted to sell the MBS through a BWIC. RBC distributed the "bid list" to its internal Fixed Income, Currency, and Commodities ("FICC")[7] sales force as well as to numerous financial institutions. Thus, because multiple generally recognized sources, other than the defaulting party itself, were available, ¶ 11(d)(2) is facially inapplicable to this case.

---

[6] See Reply Mem. Support Def.'s Mot. Summ. J. at 9, ECF No. 146 ("[I]t is undisputed that Bear Stearns, Goldman Sachs, and Lehman Brothers were generally recognized sources for []MBS pricing, including the Thornburg []MBS, in August 2007.").

[7] RBC's FICC group was responsible for facilitating the buying and selling of MBS between RBC and its clients. (Hussian Dep. 18:8-17, March 14, 2014, ECF No. 139-26).

Second, the undisputed record evidence demonstrates that RBC did not value Thornburg's MBS portfolio on a daily basis; rather, RBC's MBS trader valued the MBS only on discrete occasions. In practice, RBC's repo desk transmitted the margin calls to Thornburg, although it relied on the FICC business unit to calculate the price or Market Value justifying that margin call or roll. (See Fredericks Dep. 31:11-19, 33:15-35:6, February 12, 2014, ECF No. 139-25). FICC had the requisite expertise in trading MBS as the business unit responsible for facilitating the buying and selling of MBS between RBC and its clients. (Hussian Dep. 18:8-17, March 14, 2014, ECF No. 139-26).

Specifically, Jack Hussian, a MBS trader on the flow desk in RBC's FICC business unit, provided to RBC's repo desk "prices" or "Market Values" for Thornburg's MBS. (See Hussian Dep. 29:6-10). Hussian did not routinely price the MBS RBC had on repo, but was available to provide such pricing to the repo desk when they requested him to do so. (Hussian Dep. 28:13-25, 54:3-16, March 14, 2014, ECF No. 150-12); (see also Pl.'s Cross-Mot. Summ. J. Ex. 54, ECF No. 139-56 ("As a note the whole loan arm credit curve has steepened dramatically since our last valuation on 8/1/07 . . . .")). Thus, the Court rejects RBC's contention that it maintained daily internal marks in the ordinary course of business; and concludes that basic principles

of contract law do not prevent an interpretation of the MRA that requires a non-defaulting party to credit the defaulting party with collateral prices created by the non-defaulting party itself.

As discussed above, the MRA gave RBC two options to use Thornburg's MBS collateral to recover the loan proceeds upon Thornburg's default.  RBC could have immediately sold the MBS to a third party buyer, and credited Thornburg with the proceeds,(MRA ¶ 11(d)(i)(A)); or taken the MBS into its own inventory and credited Thornburg with "an amount equal to the price therefor on such date, obtained from a generally recognized source" (MRA ¶ 11(d)(i)(B)).  RBC elected to take the MBS into its own inventory under ¶ 11(d)(i)(B).

RBC concedes that ¶ 11(d)(i)(B) expressly requires that the credit reflect the value of the collateral "as of" the default date." (Def.'s Summ. J. Memo at 49) (emphasis added).  RBC must so concede because it argues that it was justified in its decision to disregard additional bids submitted by Lehman Brothers and Bear Stearns on August 20, 2007, because the August 20 bids were not reflective of the value of the MBS as of August 14.[8]  Moreover, it is undisputed that the MBS market was experiencing a period of disruption in August 2007.  As such,

---

[8] RBC asserts that the value of the Thornburg MBS portfolio was temporarily increased by a discount rate cut intended to kick-start the frozen credit markets, on August 17, 2007.

RBC further concedes, "it is hardly surprising that RBC's internal marks [as of August 14] were higher than an arm's-length offer to buy from a leading market participant [as of August 17]." (Reply Mem. Support Def.'s Mot. Summ. J. at 26).

Because the plain language of the MRA requires the non-defaulting party, electing to retain collateral, to calculate the credit using a price obtained from a generally recognized source "as of" the default date (see MRA ¶ 11(d)(i)(B)); and there is no dispute that RBC valued and credited Thornburg with prices obtained through a bid from an independent market participant three days after default, the Court concludes, as a matter of law, that the Trustee is entitled to summary judgment that RBC breached the MRA by failing to credit Thornburg with default date pricing.  Further, given the market conditions, there is no genuine dispute of fact that Thornburg suffered damages as a result of RBC's failure to credit it with a price determined as of the Default Date.

### 2.  Price Obtained From a Generally Recognized Source

Even where there is a breach, however, if RBC's internal marks do not constitute a "price . . . obtained from a generally recognized source," there can be no basis for using those marks as the appropriate measure of damages.  "'Under New York law . . . [t]he failure to prove damages . . . is fatal to [a] plaintiff's breach of contract cause of action.'" <u>Franconero v.</u>

UMG Recordings, Inc., 542 F.App'x 14, 17 (2d Cir. 2013) (alteration in the original) (quoting LNC Invs., Inc. v. First Fid. Bank, N.A. N.J., 173 F.3d 454, 465 (2d Cir. 1999)). The Court, therefore, must next consider whether RBC's August 14 internal valuation of Thornburg's MBS portfolio constitutes a "price . . . obtained from a generally recognized source."

Notably, RBC does not dispute that its internal valuations constitute a "price . . . obtained from a generally recognized source." RBC's corporate designee, in fact, concedes that RBC's internal marks do constitute prices from a generally recognized source. (See Rosenbaum Dep. 35:2-6, April 10, 2014, ECF No. 139-23). RBC argues it was under no obligation to credit Thornburg with a "'true value' or 'fair market value' or the 'highest available price'" (Memo. Supp. Def.'s Mot. Summ. J. at 24, ECF No. 131); and it was within its sole discretion under the MRA to calculate the credit to Thornburg using an actionable bid from an independent market participant and not an internal mark or pricing estimate (Reply Memo. Supp. Def.'s Mot. Summ. J. and Opp'n Pl.'s Mot. Summ. J. at 38, ECF No. 146). Even assuming, without deciding, that the MRA does afford RBC this discretion, the argument misses the mark.

Nothing in the plain language of ¶ 11(d)(i)(B) requires the "price . . . obtained from a generally recognized source" be derived from an executable bid. Moreover, ¶ 11(d)(i)(B)

explicitly mandates that the credit amount be determined in the same manner as done for margin maintenance.

Under New York law, "a Court 'may presume that the same words used in different parts of a writing have the same meaning.'" Eastman Kodak Co. v. Altek Corp., 936 F.Supp.2d 342, 351 (S.D.N.Y. 2013) (quoting Finest Invs. v. Sec. Tr. Co. of Rochester, 96 A.D.2d 227, 229 (N.Y.App.Div. 1983)). Pursuant to ¶ 4 of the MRA, RBC was permitted to issue margin calls to Thornburg if the "Market Value" of the Thornburg MBS declined below the specified "Buyer's Margin Amount." Paragraph 2(j) of the MRA defines "Market Value" as "the price for such [MBS] on such date obtained from a generally recognized source agreed to by the parties or the most recent closing bid quotation from such a source . . . ." (MRA ¶ 2(j)). This language is identical to the language in ¶ 11(d)(i)(B) to define the method of valuation for the MBS, except for the requirement that a "generally recognized source" be agreed to by the parties for margin call purposes.

The use of the identical language in ¶¶ 2(j) and 11(d)(i)(B) supports the Trustee's position that the provisions should be interpreted consistently. It does not follow that the values RBC assigned to the MBS on August 14, 2007, are prices from a generally recognized source for the purposes of margin maintenance but not for the purposes of crediting Thornburg for

the retained collateral.  Thus, the Court concludes that, as a matter of law, RBC's August 14, 2007 internal valuation of Thornburg's MBS portfolio constitutes a "price . . . obtained from a generally recognized source" under the MRA.

### b.  TD Levels

Nevertheless, the evidence before the Court also confirms that RBC's August 14 Margin Call prices do not reflect the price at which RBC was willing to purchase the securities.  Given the nature of the MBS market in general, an assigned value for a particular MBS may fluctuate based on different considerations with respect to the parties' intended purpose for valuing the MBS in the first instance.  For example, Hussian explained that if he were pricing an asset with the intent to own it, his price would be "contingent upon the conditions in the market" (see Hussian Dep. 64:4-18, March 14, 2014, ECF No. 128-71); whereas, if he were assigning to an asset a fair market value, he would value the asset assuming "normal [market] conditions" (see id. at 65:24-66:16).

Simultaneously with assigning the Thornburg MBS portfolio August 14 Margin Call prices, RBC assigned a TD Level.  The TD Level represented the value assigned to the MBS portfolio assuming RBC would have to purchase the assets.  (See id. at 69:4-6).  Given the market conditions on August 14, therefore, it is not surprising that there would be a marked difference

32

between RBC's Margin Call prices (assuming normal market conditions) and RBC's TD Levels (taking into account the distressed market).

RBC attempts to side-step the TD Levels by noting that the TD Levels represent market indicators, not a firm price at which they were willing to buy the Thornburg MBS portfolio. (See Pl.'s Cross-Mot. Summ. J. and Opp'n to Def.'s Mot. Summ. J. Ex. 54 at 2, ECF No. 139-56) ("[A]ll prices are indications only subject to appropriate approval regarding standing orders and clearance with risk management."). While the Court agrees that the TD Levels are indicators only, they are indicative of the value assigned to the MBS portfolio assuming RBC would have to purchase the assets.[9] (See Rosenbaum Dep. 32:16-22, April 10, 2014, ECF No. 139-23) (RBC's corporate designee describing the TD Levels as "a bid side level to the market as opposed to an estimate.").

Further, given the market conditions, and as a result of Moody's downgrade of Thornburg's Mortgage debt, it appears that RBC was contemplating a scenario in which there would be no independent bid for the Thornburg MBS portfolio. (See Pl.'s

---

[9] RBC has not put forth any argument tending to establish that the plain language of ¶ 11(d)(i)(B) requires "price" to be determined by a firm executable bid. As discussed above, because the MRA uses identical language to define the term "Market Value," the Court is aware of no facts that would prohibit it from using the terms "price" and "value" interchangeably under the MRA.

Cross-Mot. Summ. J. and Opp'n to Def.'s Mot. Summ. J. Ex. 54 at
2, ECF No. 139-56) ("Please make sure we price [the Thornburg
MBS] portfolio where we would buy it, as we will own this if
they go down."). RBC's request for Hussian to estimate a "bid
side" estimate coupled with Rosenbaum's concession that the TD
Level constitute a price from a generally recognized source
supports the conclusion that RBC's TD Levels are reflective of
the market on August 14, 2007. Because there are no other
assigned values for Thornburg securities as of the date of
default, the Court concludes that, as a matter of law, RBC's TD
Levels are the relevant and appropriate measure of damages.

Because RBC's August 14 TD Levels, assigned on the default
date, constitute a "price from a generally recognized source"
under ¶ 11(d)(i)(B) and are readily known, recorded, and
undisputed, Thornburg's damages are capable of calculation based
upon undisputed facts. The prices RBC credited to Thornburg for
the retained MBS based upon the Goldman Sachs bid were
$26,259,118[10] less than the August 14 TD Level. Accordingly, the
Court concludes that the Trustee is entitled to summary judgment
that Thornburg sustained damages in the amount of $26,259,118,
plus prejudgment interest at the rate of nine-percent from
August 14, 2007 through the date of judgment, as a direct and
proximate result of RBC's breach of ¶ 11(d)(i)(B). See Marine

_____

[10] RBC does not dispute this dollar amount.

<u>Midland Bank v. Kilbane</u>, 573 F.Supp. 469, 471 (D.Md. 1983) (applying prejudgment interest based upon choice of law provision in contract); <u>see also</u> N.Y. C.P.L.R. 5001, 5004 (McKinney 2015) (providing for the rate of interest under New York law).

### III. CONCLUSION

For the foregoing reasons, this Court will, by separate Order, DENY RBC's Motion for Summary Judgment (ECF No. 127) and GRANT the Trustee's Cross Motion for Summary Judgment (ECF No. 139).  RBC's Motion to Exclude the Testimony of the Trustee's Expert, Gregory W. Minard (ECF No. 133) is DENIED as Moot.[11]

Entered this 26th day of August, 2015

/s/

_____
George L. Russell, III
United States District Judge

---

[11] The Court did not rely upon the expert testimony of Mr. Minard to rule upon the parties' respective Motions and, therefore, need not consider RBC's Motion to Exclude the Testimony.